657 A.2d 379

**ACandS, INC., et al.**

v.

**Ida Sara Masket ASNER, et al.**

**No. 1021, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

April 27, 1995.

610

612

Dale B. Garbutt (Dana C. Petersen, Padraic McSherry Morton and Whiteford, Taylor & Preston, on the brief), Baltimore, for appellant, Porter Hayden Co.

B. Ford Davis (Dwight W. Stone, II and Whiteford, Taylor & Preston, on the brief), Baltimore, for appellant, ACandS, Inc.

Edward J. Lilly (Peter G. Angelos, Gary J. Ignatowski, Ronald E. Richardson, and Andrew M. Cantor on the brief), Baltimore, for appellees.

Argued before BISHOP, ALPERT and SALMON, JJ.

**614**

BISHOP, Judge.

## TABLE OF CONTENTS

I. FACTS

 A. Corporate and Commercial History of Appellants p. 616

 B. Work and Medical Histories of Decedents p. 617
 1. Asner p. 617
 2. Wilson p. 617
 3. Payne p. 618

II. DISCUSSION

 A. Motion for Judgment on Issue of Punitive Damages p. 619
 1. Standard of Review p. 619
 2. The *Zenobia* Standard p. 622
 3. The Evidence Against AC & S p. 623
 4. The Evidence Against PH p. 632
 5. The Holding Regarding Punitive Damages p. 636
 a. Wilson and Payne p. 636
 b. Asner p. 637

 B. Threshold Limit Values p. 637

 C. Loss of Consortium and Solatium Damages p. 641

 D. Exposure to Asbestos of Non-parties p. 646

 E. Johns–Manville Sales to Fairfield p. 650

 F. Substantial Factor Causation p. 651
 1. The Law p. 651
 2. AC & S's Substantial Factor Causation p. 652
 3. PH's Substantial Factor Causation p. 653

III. CONCLUSION

Appellee, Ida S. Asner ("Ms. Asner"), filed suit individually and as personal representative of the estate of Zalma Asner ("Asner"), in the Circuit Court for Baltimore City against thirty-one companies. The complaint alleged that Asner developed mesothelioma because of exposure to asbestos-containing products that those companies manufactured or supplied. The Asner action and the similar actions brought by appellee, Mary M. Wilson ("Ms. Wilson"), individually and as personal representative of the estate of Charles F. Wilson ("Wilson"), and appellees, Harriet G. Payne Hess ("Ms. Hess"), as personal representative, and Jean A. Payne ("Ms. Payne"), individually and as personal representative of the

estate of Milton Payne ("Payne"), were consolidated for the November 1993 Group II cluster of the mesothelioma trials.

Appellees filed motions *in limine* to exclude evidence of threshold limit values and to exclude evidence of decedents' exposures to the asbestos-containing products of non-parties. The trial court granted both motions. The jury trial began November 3, 1993, and, with the exception of appellants, ACandS, Inc. ("AC & S") and Porter Hayden Company ("PH"), all of the other companies settled, became bankrupt, or were dismissed from the case. AC & S was dismissed from the Payne action. Appellants cross-claimed for contribution against Owens–Illinois, Inc., GAF, Inc., Pittsburgh Corning Corporation, and Armstrong World Industries, Inc.

At the close of appellees' case, and at the close of all the evidence, appellants' motions for judgment on the issues of substantial factor causation and punitive damages were denied. The jury returned verdicts against AC & S in both the Asner and Wilson actions and against PH in all three actions. Damages were assessed as follows: Ms. Asner was awarded $528,003.58 in compensatory damages as personal representative of Asner's estate, $1,000,000 for loss of consortium, $1,000,000 for solatium damages, and $500,000 in punitive damages; Ms. Wilson was awarded $510,089.47 in compensatory damages as personal representative of Wilson's estate, $1,000,000 for loss of consortium, $1,000,000 for solatium damages, and $500,000 in punitive damages; Ms. Payne and Ms. Hess were awarded $549,464.49 in compensatory damages as co-personal representatives of Payne's estate; Ms. Payne also received awards of $1,000,000 for loss of consortium, $1,000,-000 in solatium damages, and $250,000 in punitive damages. The jury found for appellants as to their cross-claims. Appellants moved for judgment N.O.V. on the issue of loss of consortium and also moved for new trial or, in the alternative, for remittitur on the issue of the amount of consortium damages. The court denied appellants' motions and entered judgment on March 21, 1994. This appeal followed.

### Issues

Appellants raise several issues, which we rephrase and reorder:

I. Did the trial court err in denying appellants' motions for judgment on appellees' claims for punitive damages?

II. Did the trial court err in excluding evidence of threshold limit values?

III. Does the death of an injured spouse abate the cause of action for loss of consortium, thereby preventing a surviving spouse from recovering both loss of consortium damages and solatium damages?

IV. Did the trial court err in excluding evidence of decedents' exposures to the asbestos products of non-parties?

V. Did the trial court err in excluding evidence of the direct sales of Johns–Manville Products to Fairfield Shipyard?

VI. Did the evidence presented at trial support the jury's finding of substantial factor causation?

## I. Facts

### A. Corporate and Commercial History of Appellants

AC & S, an insulation contracting company, was incorporated in the State of Delaware in November 1957 as Armstrong Contracting and Supply Corporation. From its incorporation, until 1969, AC & S was a wholly-owned subsidiary of Armstrong Cork Company ("Cork"), presently Armstrong World Industries, Inc. ("Armstrong"). In 1969, Cork sold Armstrong Contracting and Supply Company, and the name was changed to Acands, Inc. AC & S held itself out as a manufacturer of Cork products and secured the exclusive rights to use the Armstrong name and logo. AC & S was solely responsible for all Armstrong asbestos-containing thermal insulation products from 1958 to 1969. After 1969, all products had the AC & S name and logo. Certain employees who worked for Cork became employees of AC & S, including James W. Liddell, President of AC & S from 1958 to 1981.

From 1958 until 1973, AC & S contracted with various site owners or general contractors to do insulation work. AC & S, which admits that certain of its products contained asbestos, employed insulators, men who worked with insulation products on a daily basis, from the locals of the International Association of Heat and Frost Insulators and Asbestos Workers Union. In Baltimore, AC & S used workers from Local 11. By 1972, the cements used by AC & S did not contain asbestos, and by January 1974, AC & S discontinued its use of all asbestos-containing insulation products.

PH, a Maryland insulation contracting corporation, was formed in 1966 by the merger of Reid–Hayden, Inc. and H.W. Porter & Company, Inc. At all times relevant to the case *sub judice*, PH installed insulation in industrial facilities in the Baltimore area. PH concedes that some of the materials it installed in the facilities contained asbestos.

### B. Work and Medical Histories of Decedents

#### 1. Asner

Asner was employed as an outside machinist at Bethlehem Steel's Key Highway Shipyard ("Bethlehem"), a ship repair yard, from 1941 to 1982. Asner worked around insulators who applied, cut, and mixed asbestos-containing products used to cover steam and water pipes in the engine room. In 1985, Asner was diagnosed with lung cancer, and, in 1988, he was diagnosed with mesothelioma. Asner died on December 6, 1988. AC & S, which began performing substantial insulation contracts at Bethlehem in 1965, concedes that asbestos-containing products were used at Bethlehem until 1973. Neither AC & S nor PH contest substantial factor causation for Asner.

#### 2. Wilson

Wilson worked as a sheet metal worker at Maryland Shipbuilding and Drydock Company ("Drydock") in the 1940s, prior to AC & S's incorporation, where he was exposed to asbestos. From 1946 to 1975, Wilson was a supervisor of the sheet metal workers at Allegheny Ballistics Lab ("ABL") in

Western Maryland. Wilson was in charge of the sheet metal workers responsible for covering the asbestos insulation to hold it in place on the boilers, ducts, and steam lines.

At trial, Mr. John Lohr, employed as a tin shop worker and pipe fitter at ABL from 1956 to the 1970s, testified regarding Wilson's exposure to asbestos. Mr. Lohr saw Wilson almost every day "out and around and ... checking on the jobs that his men [were] doing." Mr. Lohr insulated boilers, ducts, and steam lines with "asbestos shorts," a dry powder mixed with water to form asbestos cement. Mixing the asbestos cement generated a considerable amount of dust that made the workers' clothes appear as if they had "flour" on them. Mr. Lohr testified that the logos "Armstrong" and "Mansfield" appeared on the packages of asbestos shorts, that those two products were used the entire time that he worked as a pipe fitter, that Wilson worked around these products and was exposed to the asbestos dust, and that no precautions were taken during the mixing process to minimize the dust created. Wilson was diagnosed with mesothelioma in 1992 and died on August 23, 1992. PH does not contest substantial factor causation for Wilson's mesothelioma; however, AC & S does dispute liability regarding its causation of Wilson's mesothelioma.

### 3. Payne

Payne was employed as an electrician from 1941 until 1945 at the Fairfield Shipyard ("Fairfield") in Baltimore, where Liberty Ships were built. PH was engaged in contract work at Fairfield from 1940 through 1949 and sold or supplied asbestos-containing materials to Fairfield from 1940 to 1969. PH concedes that its employees handled asbestos-containing materials, that its employees sawed and cut those materials, that its employees mixed asbestos-containing cements, and that the handling of asbestos-containing materials generated asbestos dust.

Mr. Erwin Liphard, Payne's co-worker, testified at deposition that he saw Payne at Fairfield "all the time." Although Mr. Liphard never saw Payne using any asbestos-containing products, "[h]e didn't have to use it; it was there ... in the

engine room with them walkways and the catwalks, it was always coming down. It was like snow." According to Mr. Liphard, insulators were routinely insulating pipes with asbestos-containing cement. Payne was diagnosed with mesothelioma on January 17, 1992 and died on March 24, 1992. PH contests substantial factor causation for Payne. Additional facts will be discussed *infra.*

## II. *Discussion*

### A. Motion for Judgment on Issue of Punitive Damages

#### 1. Standard of Review

When a defendant moves for judgment at the close of the evidence offered by the plaintiff in a jury trial, "the court shall consider all evidence and inferences in the light most favorable to the party against whom the motion is made." Rule 2–519(b). In the case *sub judice*, however, the parties dispute what standard a trial court should apply when determining whether to grant a motion for judgment on the issue of punitive damages in a products liability case. Relying on *Owens–Illinois v. Zenobia*, 325 Md. 420, 601 A.2d 633 (1992), appellants argue that the trial court must grant a motion for judgment on the issue of punitive damages if no clear and convincing evidence of the defendant's actual malice exists. Appellees argue, however, that, in any civil case, "if there is any competent evidence, however slight, leading to support the plaintiff's right to recover, the case should be submitted to the jury and any motion for directed verdict denied." Before addressing whether the trial court erred in denying appellants' motion for judgment on the punitive damages issue, we shall discuss the appropriate standard that a trial court shall apply when reviewing a motion for judgment on the issue of punitive damages in a products liability jury trial.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986), the United States Supreme Court held that "the determination of whether a given factual dispute requires submission to a jury [at the directed verdict stage] must be guided by the substantive

evidentiary standards that apply to the case." Therefore, the "appropriate ... question will be whether the evidence in the record could support a reasonable jury finding either that the plaintiff has shown actual malice by clear and convincing evidence or that the plaintiff has not." *Id.* at 255–56, 106 S.Ct. at 2514. In *Southland Corp. v. Marley Co.*, 815 F.Supp. 881 (D.Md.1993), the United States District Court for the District of Maryland, applying Maryland products liability law, denied the defendant's motion to preclude the jury from considering the issue of punitive damages with respect to the plaintiffs' "failure to warn" claim. The court determined that the plaintiffs had established, by clear and convincing evidence, the manufacturer's actual knowledge of the product's danger and its deliberate disregard for the potential harm to consumers. *See id.* at 885–86.

Moreover, the Court of Appeals, in *United States Gypsum Co. v. Mayor & City Council of Baltimore,* 336 Md. 145, 647 A.2d 405 (1994), held that the City had not introduced sufficient evidence of actual malice "for the punitive damages claim to have been submitted to the jury." *Id.* at 194, 647 A.2d 405. In other words, the plaintiff did not establish "the requisite malice by clear and convincing evidence." *Id.* at 188, 647 A.2d 405. In *Sard v. Hardy,* 281 Md. 432, 379 A.2d 1014 (1977), the Court of Appeals held that the plaintiff had not produced sufficient evidence to withstand a motion for directed verdict as to her breach of express warranty claim, "particularly in light of the requirement that the jury find the existence of the warranty by *clear and convincing evidence.*" *Id.* at 453, 379 A.2d 1014 (emphasis added). *See also Sealover v. Carey Canada,* 793 F.Supp. 569, 570–71 (M.D.Pa.1992) (directing entry of summary judgment in defendants' favor on the punitive damage claims because the plaintiff did not show by a preponderance of evidence [Pennsylvania's standard of proof for entitlement to punitive damages] that the defendant had actual knowledge of the hazard); *School Dist. v. United States Gypsum Co.,* 750 S.W.2d 442, 445–46 (Mo.Ct.App.1988) (holding that, in order to submit a claim for punitive damages to a

jury in a product liability action, a plaintiff is required to produce evidence of actual knowledge).

■ Whether there is *legally sufficient* evidence offered to justify submission of an issue to the jury is a question of law for the court. *McIntyre v. Saltysiak,* 205 Md. 415, 424, 109 A.2d 70 (1954) (emphasis added). In *Harris v. State,* 81 Md.App. 247, 293, 567 A.2d 476 (1989), Judge Moylan, speaking for this Court, wrote:

> With respect to the burden of persuasion, the role of appellate review is very limited. In the case of an issue of fact submitted to a jury, the appellate court is concerned to see that the trial court properly advised the jury as to which standard of persuasion to employ and that it then properly defined for the jury what that standard is.

We agree with appellants that the standard of proof must be taken into account when evaluating the legal sufficiency of the evidence. Therefore, if a plaintiff establishes, by clear and convincing evidence, that a defendant's conduct was characterized by actual malice, then the evidence is legally sufficient to submit the issue of punitive damages to the jury in a products liability case. *See Owens–Illinois v. Zenobia,* 325 Md. 420, 601 A.2d 633 (1992) (establishing the "clear and convincing evidence of actual malice" standard for an award of punitive damages in a products liability case, and instructing the trial court, on remand, to determine whether there was sufficient evidence, based on the new standards, to present the issue of punitive damages to the jury); *Eagle–Picher Indus. v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992) (remanding issue of punitive damages in asbestos-related products liability case for new trial to determine whether, and if so, what amount of punitive damages should be awarded under the *Zenobia* standard); *Owens–Illinois v. Armstrong,* 326 Md. 107, 129, 604 A.2d 47, *cert. denied,* —— U.S. ——, 113 S.Ct. 204, 121 L.Ed.2d 145 (1992) (reversing and remanding the jury award of punitive damages so that the plaintiffs can "prove their entitlement to punitive damages by clear and convincing evidence based on the standards set forth in *Zenobia.*") If there is evidence of

actual malice that the jury could reasonably find to be clear and convincing, then the motion for judgment must be denied.

> [W]hen ruling on a motion for a judgment the trial judge must consider the evidence, including the inferences reasonably and logically drawn therefrom, in the light most favorable to the party against whom the motion is made.... An appellate court reviewing the propriety of the grant or denial of a motion for judgment by a trial judge must conduct the same analysis.

*James v. General Motors Corp.*, 74 Md.App. 479, 484–85, 538 A.2d 782, *cert. denied*, 313 Md. 7, 542 A.2d 844 (1988).

## 2. The *Zenobia* Standard

As indicated *supra*, the Court of Appeals, in *Zenobia*, changed the standards of proof that a party must show before legally recovering punitive damages. "In a non-intentional tort action, the trier of facts may not award punitive damages unless the plaintiff has established that the defendant's conduct was characterized by evil motive, intent to injure, ill will, or fraud, *i.e.*, 'actual malice.'" *Zenobia*, 325 Md. at 460, 601 A.2d 633. Noting, however, that "'actual malice' ... does not translate easily in products liability cases[,]" *id.*, the Court of Appeals held that

> in order for actual malice to be found in a products liability case, regardless of whether the cause of action for compensatory damages is based on negligence or strict liability, the plaintiff must prove (1) *actual knowledge* of the defect on the part of the defendant, and (2) the *defendant's conscious or deliberate disregard* of the foreseeable harm resulting from the defect.

*Id.* at 462, 601 A.2d 633 (emphasis added). Actual knowledge, however, includes the wilful refusal to know, *i.e.*, a defendant cannot "shut his eyes or plug his ears when he is presented with evidence of a defect and thereby avoid liability for punitive damages." *Id.* at 462 n. 23, 601 A.2d 633.

In *Zenobia*, the Court relied on its decision in *State v. McCallum*, 321 Md. 451, 583 A.2d 250 (1991), which recognized

that actual knowledge, in the form of "deliberate ignorance" or "willful blindness," "exists where a person believes that it is probable that something is a fact, but deliberately shuts his or her eyes or avoids making a reasonable inquiry with a conscious purpose to avoid learning the truth." *Id.* at 458, 583 A.2d 250. Moreover, knowledge under the recognized rule of law may be found, when, with an unlawful purpose in mind, a person deliberately shuts his eyes to avoid knowing the obvious. *Id.* at 460, 583 A.2d 250.

A conscious or deliberate disregard on the defendant's behalf "requires a bad faith decision by the defendant to market a product, knowing of the defect and danger, in conscious or deliberate disregard of the threat to the safety of the consumer." *Id.* at 463, 583 A.2d 250. The *Zenobia* court also recognized that, because of the penal nature of punitive damages, a heightened burden of proof was appropriate, and therefore, "in *any* tort case a plaintiff must establish by *clear and convincing evidence* the basis for an award of punitive damages." *Id.*, 325 Md. at 469, 601 A.2d 633 (second emphasis added). "[T]o be clear and convincing, 'the proof must be "clear and satisfactory" and be of such a character as to appeal strongly to the conscience of the court.' " *1986 Mercedes Benz 560 CE v. State,* 334 Md. 264, 283, 638 A.2d 1164 (1994) (quoting *First Nat'l Bank v. USF & G,* 275 Md. 400, 411, 340 A.2d 275 (1975)).

### 3. The Evidence Against AC & S

AC & S argues that, because Asner and Wilson were "bystanders," rather than insulators or AC & S employees, AC & S did not have actual knowledge that workers, such as Asner and Wilson, faced any health hazard by working around AC & S insulators or AC & S products. Appellees argue, however, that AC & S did have actual knowledge of the health hazards faced by bystanders such as Asner and Wilson because, although Asner and Wilson were not AC & S insulators, they were workers exposed at the same time, under the same conditions, and at the same location to the working environments to which AC & S insulators were exposed.

■ AC & S first argues that Asner and Wilson were not members of a class of persons about whom AC & S had actual notice of health risks from AC & S products. AC & S bases this assertion on the insulator-bystander distinction. Specifically, AC & S argues that it could not have knowledge that non-AC & S employee-bystanders in Asner or Wilson's position would be subject to harm simply because AC & S insulators suffered from asbestos-related injuries. AC & S relies on the following language:

"Evidence of a generalized knowledge that asbestos poses a danger to a narrow class of unprotected persons who are exposed during the application or removal of asbestos-containing materials in buildings will not, under the strict requirements for a submissible punitive damages case, support an inference that [defendants] had knowledge of a danger to the much broader class of persons who were merely present in such buildings at other times[.]"

*U.S. Gypsum Co. v. Mayor & City Council of Baltimore,* 336 Md. 145, 188–89, 647 A.2d 405 (1994) (quoting *Kansas City v. Keene Corp.,* 855 S.W.2d 360, 375 (Mo.1993) (en banc)).

In *Gypsum,* however, the injured class of persons, to which the Court referred in the above quotation, were ordinary building users exposed to an asbestos product after it had already been installed in the building. The evidence actually introduced in *Gypsum* focussed solely upon hazards posed to *industry workers and workers in related trades,* workers such as Asner and Wilson, and not hazards posed to building users. *Id.* at 190, 647 A.2d 405. In *Smith v. Celotex Corp.,* 387 Pa.Super. 340, 564 A.2d 209 (1989), also relied upon by AC & S, the court made a justifiable risk distinction between asbestos factory workers handling *raw* asbestos and construction workers handling the *finished* product at locations with different working conditions. Although we agree with AC & S that risk distinctions can exist between classes of persons exposed to asbestos, depending on the degree, frequency, and duration of exposure, the evidence in the case *sub judice* supports the conclusion that Asner and Wilson were exposed to AC & S products in a comparable degree, frequency, and duration as

AC & S insulators. Any risk distinction in the case *sub judice* between AC & S insulators and Asner and Wilson, as it relates to the "actual malice" necessary for punitive damages is, therefore, illusory.

█ The evidence presented at trial regarding AC & S's actual knowledge is as follows:

September 12, 1952—A letter from Thomas R. Nunan, District Manager of Cork Building Materials Division, to The Travelers Insurance Company ("Travelers"), Cork's insurer, regarding the worker's compensation claim of employee, Richard Rothwell, who was alleging an asbestos-related disease. Attached is an inspection report made by an agent of the Massachusetts Department of Labor and Industries. A copy of the letter and report is sent to Mr. Liddell, employee of Cork, and later president of AC & S.

April 30, 1954—Cork receives a letter from Travelers indicating that the Workmen's Compensation Commission ("WCC") determined that Mr. Rothwell's cancer was caused by his occupational exposure to asbestos.

July 25, 1957—Cork officers in Buffalo, New York, and Lancaster, Pennsylvania, receive a memorandum from Travelers regarding the asbestosis claim of an employee and the costs to Cork of such claims. A copy of the memorandum is sent to Mr. Liddell.

July 29, 1959—A letter from Cork's insurance department to a California law firm regarding an employee's asbestosis claim. The letter indicates that Cork is aware that the attorneys "have had considerable experience handling asbestosis claims." Copies of the letter are sent to AC & S officers in San Francisco and Lancaster.

August 5, 1959—A letter from Cork's insurance department to the AC & S San Francisco office concerning a workmen's compensation claim filed in Nevada. The letter states:

> If the number of claims keep on increasing as they have in the past several weeks, *most of your time will be spent on asbestosis and pneumoconiosis claims.* Seri-

ously though, it is important that we cooperate with our insurance carriers and give them all the help we can for two reasons. First, these claims usually result in *total permanent disability* which means compensation awards of which we will pay our proportionate share. Second, there is some doubt that our type of work could cause asbestosis. However, since one employee collected under the California Occupational Disease Law, we have had quite a few asbestosis claims. Our only concern, where an award has been made, is to be sure we are not charged with more than our proportionate share.

(Emphasis added). A copy of this letter is sent to the AC & S office in Lancaster.

January 16, 1961—A memorandum from the AC & S San Francisco office is sent to the AC & S Lancaster office concerning the asbestosis claim of an employee.

January 17, 1962—A letter from Wallace B. Hofferth, AC & S's assistant general manager of its insurance department, to the AC & S office in Lancaster listing *29* occupational disease claims and the amounts recovered from 1953 to 1962, *particularly asbestosis and those akin to it.* Hofferth writes: "We have a rather imposing list of cases which we have shown below. This will serve to indicate the importance of this type of claim in the overall workmen's compensation cost picture." (Emphasis added).

May 31, 1962—A memorandum from R.B. Ross, an AC & S officer in Los Angeles, to J.E. Zeller, an AC & S officer in Lancaster, regarding the Board of Directors meeting of the Associated Insulation Contractors of the Western States. The memorandum states that "a lengthy discussion was held relative to the increasing number of claims from asbestos workers with respect to respiratory illness and lung cancer, *supposedly the result of breathing asbestos dust and glass fiber dust.*" (Emphasis added). In the memorandum Ross discusses the increasing number of claims on the West Coast and California and notes that "[t]he result could be a

heavy increase in our insurance cost." A copy of the memorandum is sent to Mr. Liddell.

March 25, 1963—A letter from Mr. Hofferth, of AC & S's insurance department, to Mr. Fred L. Gardner in the AC & S Lancaster office, responding to a request for information on asbestosis cases, particularly prevention. The letter indicates that *36* asbestosis claims have been filed by employees,

> a rather imposing list of cases and will serve to indicate the importance of this type of claim in the over-all workmen's compensation insurance cost. Claims of this nature are on the rise.... Some states hold the last employer solely responsible for occupational disease claims.... There isn't much you can do to defend successfully a valid occupational disease claim. *Obviously prevention is the key.*"

(Emphasis added).

October 30, 1963—A letter from Dr. Edgar F. Mauer, physician of an AC & S employee, to Aetna Casualty & Surety Company ("Aetna"), an AC & S insurer, regarding the workmen's compensation claim of an employee. The letter states:

> [There has been] a moderate reduction in pulmonary function. It is obvious that this reduced function is due ... to the inhalation of asbestos fibers.
>
> ....
>
> Asbestosis is a progressive disease. It is likely that the degree of pulmonary fibrosis will progress in the coming years. The lesions is [sic] permanent, it is in all likelihood progressive...."

June 2, 1964—A letter from John P. Harrington, the General Sales Manager of Eagle–Picher Industries ("Eagle"), to Mr. W.B. King of the AC & S Lancaster office, states that Eagle is going to add "a cautionary note to containers where the *products involved included asbestos as a constituent.*" (Emphasis added). Eagle asks if AC & S wants to take similar action on the bags of cement that

Eagle manufactures for AC & S. Testimony at trial indicates that AC & S did not take any action in response to Eagle's suggestion. The warning stated:

> *Caution:* This product contains asbestos fiber.
>
> Inhalation of asbestos in excessive quantities over long periods of time may be harmful.
>
> If dust is created when this product is handled, avoid breathing the dust.
>
> If adequate ventilation control is not possible wear respirators approved by the U.S. Bureau of Mines for pneumoconiosis producing dust.

January 19, 1967—A letter from Mr. Hofferth, AC & S Insurance Manager, to Mr. Gardner in the AC & S Lancaster office, reporting that *82* asbestosis claims have been filed from 1952 forward, with *42* claims settled for a total of $60,394, 16 of which were settled with no payment, and 40 claims still unsettled.

February 6, 1967—An inter-office communication is sent by A.L. Stokely from the AC & S Washington office to Mr. Zeller of the AC & S Lancaster office indicating that the Richmond Local of the Asbestos Workers had x-rays of workers and quite a number of workers, including 6 AC & S employees, were diagnosed with asbestosis. The letter continues:

> *I really wonder if we have been sufficiently realistic in our thinking concerning asbestosis.* Originally, we had half-way assumed that only those with a high intake of alcohol contracted the disease, and that most of them were quite happy to live on compensation without further effort. . . .
>
> . . . .
>
> The potential for disability in the future would appear to very real, and the cost to us under Workmen's Compensation could be quite considerable. . . .
>
> I'd like to recommend a strong push on our part, and I would hope also on the part of other National Insula-

tion Contractors and their compensation carriers, to investigate asbestosis very thoroughly.

Not only is it quite obvious that prodigious compensation claims are possible for the future, but more importantly, *I think we owe our workmen every effort to investigate and to see if we can avoid this disease, which is bound to be somewhere between partly disabling and fatal.*

(Emphasis added).

February 13, 1967—A letter from Mr. Gardner, AC & S Contract Officer, to Mr. Hofferth at the AC & S Lancaster office regarding the asbestosis claims of construction workers. Mr. Gardner suggests advising "Aetna of our problem and solicit their assistance in ways to minimize the Workmen's Compensation claim possibilities. We will be investigating this problem in more depth...."

March 29, 1967—A letter from Mr. Hofferth to Aetna, to set up a meeting to discuss "our asbestosis problem."

April 10, 1967—An AC & S internal memorandum is circulated regarding a meeting of AC & S officials who discussed the asbestosis claims.

We discussed detection as well as prevention of asbestosis, but it was generally concluded that there was little AC & S could do as an individual employer. Whatever action would be taken would require the sanction and support of the international asbestos worker's union. This is really the only way to exercise control.... *The union has apparently had this problem under consideration for the past two years, but we know nothing concrete coming out of it.*

*While nothing concrete came out of this meeting,* we do have a better understanding and appreciation of the problem, especially its magnitude and difficulty. Even awareness of the problem is at least a beginning.

(Emphasis added).

August 16, 1967—A letter from Mr. Hofferth to Mr. Gardner regarding asbestosis claims and their prevention. The letter mentions that eight separate times, from 1961 to

1967, different AC & S officials "expressed concern" over asbestosis and prevention, yet there was never any concrete action or results. Also, a total of *86* asbestosis claims have been filed against Armstrong/AC & S since 1954; 66 being filed between 1960–67, with a total of $100,000 in claim payments. Aetna recommends pre-employment x-rays. Mr. Hofferth states: "I do strongly feel that the time has arrived for us to take a position concerning this recommendation and the overall asbestosis claims situation which confronts us." In his letter, Mr. Hofferth calls for x-rays, periodic check-ups, and a concerted effort at all job locations to keep employees from working in conditions where the atmosphere contains harmful quantities of the disease-producing dust. "Bear in mind that you are the largest insulation contractor in the country . . . ."

To promote the sale of its products, AC & S printed various brochures in 1964, 1968, and 1970 that praised the quality of its asbestos insulation; however, AC & S made no statements regarding potential health hazards, the need for dust suppression, or precautionary measures to take when using the products. AC & S revised its construction manual on August 19, 1968. The section of the manual regarding necessary protective equipment under standard safety precautions stated that "[a]n approved type respirator bearing a *Bureau of Mines* number should be made available for use by employees who cut pipe covering and block insulations with power saws and also for use by employees who do extensive mixing of insulating cement." Additionally, the manual contained the National Insulation Manufacturers Association's ("NIMA") recommendations for the safe handling and application of asbestos materials.

In the April 12, 1972 revised manual, AC & S made the following statement: "We are aggressively moving to eliminate the use of products which contain asbestos. Every effort must be made to inform our customers of the hazards of asbestos dust and encourage them to evaluate and select asbestos free materials for their specifications." In the January 25, 1972 revised manual, AC & S stated: "We will not

furnish, handle, use, or install products containing asbestos." As of April 9, 1973, the AC & S construction manual contained OSHA regulations regarding exposure to asbestos dust.

Mr. Charles Fort, an AC & S insulator and foreman between 1954 and 1972, testified that, during his employment for AC & S, no specific training or safety programs existed. Moreover, Mr. Fort said that he never saw the NIMA safety practices recommended in the AC & S manual, that AC & S never told him about necessary precautions for keeping dust to a minimum, and that AC & S never told him to wear a respirator when exposed to excessive dust. According to Mr. Fort, AC & S never informed him of any protective measures that would eliminate excessive exposures to asbestos dust, and AC & S made no effort to protect people on the job, *i.e.*, AC & S did not supply respirators. Mr. Fort had to purchase a respirator for himself and said that it was a matter of *choice* if a worker wanted to wear a respirator.

AC & S admitted, during discovery, that it never conducted research regarding the hazards of asbestos while marketing and/or selling asbestos, and that it never conducted any tests with the purpose of minimizing or eliminating the inhalation of dust. AC & S never contributed to asbestos research or asbestos-related disease research and it never hired an industrial hygienist or medical director.

We have set forth, in considerable detail, the evidence presented to the jury in support of the punitive damages claim. Appellees produced sufficient evidence of AC & S's actual knowledge of the hazardous nature of its products and its conscious disregard of the health risks. Both Asner and Wilson were exposed to AC & S products when AC & S's conduct amounted to "actual malice," based on the *Zenobia* standard. Throughout the late 1950s and 1960s correspondence clearly indicated that asbestosis was an increasing problem among AC & S employees. AC & S was aware of the hazards of asbestos, failed to place warning labels on their products, failed to make any "effort" to eliminate the use of asbestos-containing products until 1972, and did not stop using

the products until 1974. Until that time, however, testimony at trial indicated no safety precautions, no warnings, no respirators, and no action by AC & S relating to the hazards of asbestos. AC & S, by its own words, admits inaction as it relates to testing, research, and investigation. This conduct clearly amounts to actual knowledge on AC & S' part, or, at the very least, a wilful refusal to know, of the hazards of asbestos, and its deliberate disregard of the foreseeable harm. Reviewing this evidence, including the inferences reasonably and logically drawn therefrom, in the light most favorable to appellees, we hold that the trial court did not err in denying AC & S's motion for judgment on the issue of punitive damages.

### 4. The Evidence Against PH

PH, like AC & S, argues that, with respect to each appellee, there is not clear and convincing evidence that PH had actual knowledge of the potential risks of exposure to asbestos or that it deliberately disregarded those potential risks. To the extent PH's argument is premised on the risk distinction between PH insulators and bystanders, our discussion, *supra*, is controlling. The evidence presented at trial regarding PH's actual knowledge may be summarized as follows:

1928—PH received a copy of *Asbestos*, an industry magazine. The issue contained announcements regarding PH and also contained an article about pulmonary asbestosis.

1930—PH received a copy of *Asbestos*. The magazine contained an article regarding asbestosis that stated the following:

Some attention is being given by the U.S. Bureau of Labor Statistics of the Department of Labor, to Pulmonary Asbestosis, a disease resulting from exposure to asbestos dust. The Bureau urges the establishment of efficient exhaust systems and the introduction of other safety methods.

. . . .

It is said that the asbestos dust causes a pulmonary fibrosis, attacking the bases of the lungs, and, like, siliensis, it is frequently complicated by tuberculosis.

June 1944—PH advertised in the June 1944 issue of *Heating and Ventilating.* The magazine contained an article entitled "Dust as an Industrial Health Hazard" that discussed asbestosis and the hazards and fatality of the end-use of asbestos-containing products.

Prior to 1953—Two claims of asbestosis were filed by PH employees.

February 1956—PH employee, Mr. Frederick M. LeGrand, filed a worker's compensation claim because of asbestosis contracted as an insulation worker.

December 19, 1956—Mr. M.R. Carr, president of H.W. Porter & Company, received a letter from The Travelers Insurance Company ("Travelers"), PH's insurer, in which Travelers stated:

> The Travelers Insurance Company has been underwriting your Workmen's Compensation and General Liability since January 1953 and unfortunately, there have been some serious losses during this period.
>
> . . . .
>
> [Regarding the Frederick LeGrand case] [a]s a result of his employment, he alleges that he was exposed to asbestos dust which caused the present lung condition and aggravated a preexisting heart condition. He is a very sick man incapable of working. The condition will probably worsen to the extent that he will eventually become 100% disabled. . . . The outcome of the case looks bad.
>
> *This is not the first asbestosis case.* It was an asbestosis case or a suspected case which brought about the Employers Liability request that all employees have a pre-employment physical. We are aware and The Travelers are aware that due to your type of operation and the hiring of temporary employees, pre-employment physicals are impossible. The wearing of respirators on all jobs involving asbestos insulating is also almost impossible.

. . . .

> As the result of this lack of control, The Travelers do not wish to continue insuring what they consider to be a business loss. Because of your method of operation, they feel that losses due to asbestos dust is a risk you must assume.

(Emphasis added).

January 18, 1957—Travelers sent Mr. Carr a letter.

With reference to our recent discussion in Baltimore and The Travelers['] apparent concern over the exposure to asbestos dust, it is our feeling that it would be to your advantage to have an inspector from The Travelers visit a typical job to determine what the dust conditions really are. In this way we hope to avoid any further problems with The Travelers in regard to exposure to asbestosis.

May 27, 1957—PH circulated an internal memorandum indicating that PH knew of Mr. LeGrand's debilitating injury and that Mr. LeGrand prevailed before the WCC.

February 14, 1963—PH sent a letter to Insurance Company of North America ("ICNA") regarding employees' asbestosis claims and the compensability of the claims under Worker's Compensation Law.

August 1, 1963—PH's insurer sent a letter to PH that stated: "You will note that there are four lung-dust disease cases totaling close to $60,000 in losses. . . . If there is any possibility of giving pre-employment x-rays, it certainly should be done."

August 12, 1963—PH circulated an internal memorandum stating: "You will see there have been four recent lung-dust cases which seriously affect our rates. Our agent recommends pre-employment x-ray examinations. I agree that we should require all new employees hired as Asbestos Workers to successfully pass a medical examination as a requirement for employment."

December 20, 1963—PH circulated an internal memorandum stating that "if asbestosis is more prevalent in the Metropolitan New York and New Jersey area, I am wonder-

ing if we might get a better rate in the South if we had separate carriers for the Porter Company and the Reid Hayden branches."

July 19, 1977—PH received a letter from an employee's attorney regarding an asbestosis claim.

June 25, 1979—The North Carolina Industrial Commission received a letter regarding a PH employee and his working conditions. The employee stated that his "job had been very dusty and that no mask or respirator was offered for his use until the past five to seven years, but by that time, dyspnea had become so marked that he could not tolerate wearing a mask or respirator."

The deposition testimony of Charles Beyer, superintendent of PH as of 1950, was read into evidence. Mr. Beyer, who worked from 1936 until 1965 as a member of the Local 32 asbestos workers union, was never told about Mr. LeGrand's illness. In the mid 1950s, Mr. Beyer was told, however, that Mr. LeGrand was paid off for his asbestosis claim. "[They] told me to keep it very quiet, that he was paid off for something else. That was my bosses." Various PH employees also told Mr. Beyer that there were quite a few asbestosis cases at the time and that they wanted things "hushed up because they [didn't] want the men to know about it in the field because ... they would all be going after it."

Mr. Beyer was never instructed to inform workers of the health hazards associated with asbestos. PH never put warning labels on the products it distributed and Mr. Beyer never saw any health warnings on the boxes. Mr. Beyer testified that PH knew of employees, other than Mr. LeGrand, afflicted with asbestosis. According to Mr. Beyer, he was told that "[t]here [were] too many pipe workers going for these different things, this asbestos, and it hurt[ ] the business and everything. [PH wanted] to keep this quiet." William Whitley, a PH insulator from 1940 until 1982, testified that workers did not wear respiratory protection, that no PH employee had ever advised them to wear respiratory protection, and that he

was never advised that breathing the asbestos dust could cause harm.

During discovery, PH admitted that no field tests were done to determine how much dust, containing asbestos fibers, was created or generated. Prior to 1971, no warnings were given about the health hazards of asbestos to those working in the vicinity of PH employees using asbestos products. Prior to 1970, PH did not seek any information from Johns-Manville or other manufacturers regarding the health hazards caused by asbestos exposure. Because the time periods of exposure to PH asbestos varies with each appellees' case, we shall discuss each case separately.

### 5. The Holding Regarding Punitive Damages

#### a. Wilson and Payne

As indicated *supra*, Wilson was a sheet metal worker at Drydock in the 1940s. Wilson's exposure to PH asbestos products occurred between 1941 and 1945 at Drydock. Payne worked as an electrician at Fairfield. His exposure to PH asbestos products occurred between 1941 and 1945 at Fairfield. During this time period, the evidence of PH's actual knowledge of the hazards of asbestos-containing products consisted of three articles, in which there are discussions, to varying degrees, of asbestosis and other health hazards of asbestos. One article specifically discusses the fatality of the end-use of asbestos-containing products. Appellees also point to the 1939 Maryland Workers' Compensation Statute, offered into evidence, defining asbestosis as an occupational disease and also defining any process or occupation involving exposure to, or direct contact with, asbestos dust as an extrahazardous employment. Although this evidence may not appear as overwhelming as that presented against AC & S, it does, however, indicate that PH had knowledge of the hazards of asbestos products. At the very least, there was enough evidence introduced against PH to generate a jury question regarding PH's punitive damage liability. We hold, therefore, that the trial court did not err in submitting the issue of punitive damages to the jury in the cases of Wilson and Payne.

### b. Asner

 Asner was exposed to PH asbestos products at Bethlehem, from 1941 until 1982. The evidence, set forth in detail above, does establish PH's actual knowledge and its deliberate disregard of the risks posed by asbestos to workers such as Asner. PH, by 1956, was aware of the hazards of asbestos. In addition to the asbestos claims, Travelers discontinued insuring PH due to the "asbestos dust risk." Additionally, PH deliberately kept asbestos claims "hushed up," and "paid off" asbestosis claimants to "keep things quiet." Moreover, PH failed to place warning or health labels on their products, failed to advise employees regarding respiratory protection, and failed to warn employees about the health risks regarding asbestos.

PH did not seek out information regarding the health hazards of asbestos until 1970 and, prior to 1971, did not warn workers about the health hazards of asbestos. Until that time, however, testimony at trial indicated no safety precautions, no warnings, no respirators, and no action by PH concerning the hazards of asbestos. PH, by its own words, admits that it failed to test, research, and investigate the health hazards of asbestos. Such conduct clearly amounts to actual knowledge on PH's part, or, at the very least, a wilful refusal to know, of the hazards of asbestos, and its deliberate disregard of the foreseeable harm. We hold that the trial court did not err in submitting the issue of punitive damages to the jury in the Asner case.

## B. Threshold Limit Values (TLVs)

 A TLV is the minimum exposure level of asbestos particles per cubic foot of air in an industrial setting, below which level, it is believed, exposure will not cause illness. Appellants argue that, because appellees had the burden of proving knowledge on the part of appellants, TLV evidence should have been introduced so that appellants could rebut the knowledge component of appellees' cases.

Specifically, appellants argue that the TLV evidence was necessary to show that appellees were not foreseeable plaintiffs. TLVs are part of the "state of the art" evidence that establishes "the presence or absence of knowledge in the expert community." *Zenobia*, 325 Md. at 435. Appellants argue that, based on *Zenobia*, state of the art evidence is relevant to determine what they "should have known," and to prove, therefore, that they acted reasonably and that warnings were not required under the state of scientific knowledge at the time.

We hold that the trial court properly excluded the TLV evidence. Appellants admit that they had no actual knowledge of TLVs during the relevant time periods. Appellees, in a strict liability failure to warn case, do not need to prove what appellants knew *and* should have known. In *Zenobia*, the Court of Appeals stated that part of proving strict liability, based on a failure to warn, requires a plaintiff to show what the defendant knew *or* should have known. *Zenobia*, 325 Md. at 437, 601 A.2d 633. Moreover, the Court stated that "for the purposes of the 'should have [known]' component," state of the art is relevant. *Id.* If a plaintiff is not relying on the "should have known" component, however, it follows that state of the art evidence is not relevant.

In *Zenobia*, the Court of Appeals did not hold that state of the art evidence must always be admitted in a "failure to warn" case. The Court, rather, indicated that "the presence of the required knowledge [in a failure to warn case] *can* be established by evidence that the dangerous quality of the product should have been known by a manufacturer because it was known in the scientific or expert community." *Id.* at 433, 601 A.2d 633 (emphasis added). It is not mandatory, therefore, that knowledge, or lack thereof, be established with state of the art evidence. *See Lohrmann v. Pittsburgh Corning Corp.*, 782 F.2d 1156, 1164 (4th Cir.1986) ("[I]n Maryland, state of the art *can* be considered in a strict liability tort case where the claimed defect is a failure to warn.") (emphasis added).

We agree with appellees that, once a defendant's *actual knowledge* is shown, state of the art evidence is not necessary to show what the defendant "should have known" or "could have known." The "should have known" component can make the heavy burden placed on a plaintiff in a strict liability failure to warn case less onerous. If a plaintiff is successful, however, in proving actual knowledge, it is axiomatic that the plaintiff need not prove what the defendant "should have known." *See Southland Corp. v. Marley Co.,* 815 F.Supp. 881, 885 (D.Md.1993) ("a manufacturer may be held liable . . . if it has actual *or* constructive knowledge of a defect, *or* if it should have known of the defect. . . .") (emphasis added).

In their reply brief, appellants concede that " 'state of the art' evidence is not required to find negligence or strict liability for failure to warn if actual knowledge is proved." As indicated *supra,* we held that there was legally sufficient evidence to find that both AC & S and PH had actual knowledge of the hazards of asbestos. The "state of the art evidence" that appellants contend should have been admitted, by their own concession, need not have been admitted; appellees met their burden of proving that AC & S and PH had actual knowledge, therefore, what appellants "should have known" was irrelevant.

Despite appellants' contentions that the TLV evidence was excluded erroneously, this data did, in fact, come into evidence. The TLV evidence that appellants wanted to introduce was that in 1938 a tentative TLV for asbestos was five million particles per cubic foot; that the TLV was accepted by various government bodies; and that studies indicated that, during the relevant time period, shipyard workers were not exposed to dust in excess of accepted TLVs.

During trial, counsel for appellants made a proffer regarding TLV testimony:

I have personally examined Dr. Castleman and read many of his depositions and would proffer that he would testify, if we were permitted to ask him, that threshold limit values for asbestos were tentatively established in 1938 at five

million particles per cubic foot of air. That level of exposure was thought to be safe. That the American Conference of Governmental and Industrial Hygienists adopted that standard in the late 1940's, and kept that standard until the late 1960's for exposure to asbestos.

Also, he would testify that there are articles published in the late '50's and early '60's indicating that people in the shipyards are not exposed to levels of asbestos exceeding five million particles per cubic foot.

The following colloquy occurred the day after counsel for appellants made the above quoted proffer:

[COUNSEL]: Your Honor, may I add just a brief remark on the record, to add to the proffer that Mr. Davis gave yesterday as to what Dr. Castleman would have testified to in regards to the TLV's?

THE COURT: Sure. *But keep in mind that his testimony pretty well covered what we had all discussed was not going to be brought out, but he brought it out using different terminology than the TLV's, didn't he? He talked about that, and when he talked about the situation, on cross examination, which was very good, I might add, it brought it out and nobody objected, so it's not going to be an issue. But he has already said everything that Mr. Davis, in his proffer, wanted to say to The Court. He said every word of it in his testimony, his cross examination.*

(Emphasis added.) The jury did hear, through appellants' cross-examination of appellees' expert witnesses, that there was a tentative TLV of five million particles per cubic foot, that it was thought to be a tentative safe level, and that respectable studies, such as the *Dreessen* report and the *Fleischer/Dinker* report, concluded that shipyard pipecovering was not a dangerous occupation.

Appellants contend that they were still prejudiced because, in accordance with granting appellees' motion *in limine* to exclude evidence of TLVs, the trial court instructed the jury that any evidence regarding TLVs could only be considered in

the case against Owens–Illinois, Inc. The instruction that appellants refer to was given as follows:

> Secondly, when evidence is admitted in particular matters against particular individuals or companies, that evidence may only be considered as to that company and may not be considered for any other purpose.
>
> I have mentioned that to you before, but I wanted to remention that to you so that there is no crossover of your consideration of evidence against one party against another party.

This instruction, however, would not have affected the jury's consideration of the TLV evidence. To begin with, the instruction is very vague and general, and does not specify that TLV evidence must only be considered with respect to Owens–Illinois and not AC & S and PH. Moreover, this instruction was given over a week after the jury heard the testimony regarding TLVs that is reprinted *supra*. Finally, the TLV testimony came into evidence via effective cross-examination. The trial court and both parties agree that it was elicited and discussed in a manner such that it did not qualify as the "TLV evidence" that the trial court agreed to exclude *in limine*. Therefore, even assuming that the jury understood that the limiting instruction applied to TLVs, the jury would have no reason to heed these guidelines with respect to the cross-examination testimony.

Accordingly, we hold that, because actual knowledge was proven, the TLV evidence was not relevant. Even if the trial court erred in preventing appellants from directly producing this evidence, the error is harmless because the evidence was introduced, without objection—a fact that the trial court acknowledged and which the parties, at the time of the trial court's statement, did not dispute.

### C. Loss of Consortium and Solatium Damages

■ Appellees assert that appellants failed to preserve this issue for appeal. Rule 2–522(c) provides, in pertinent part, that

[n]o party may assign as error the submission of issues to the jury, the instructions of the court, or the refusal of the court to submit a requested issue unless the party objects on the record before the jury retires to consider its verdict, stating distinctly the matter to which the party objects and the grounds of the objection.

When given the opportunity to discuss errors on the verdict sheets, counsel for PH stated:

I do want to raise—well, let me just say there's one objection to a question on the form, Your Honor. I'm making this *for the record* because I have no cite to give to the Court at this time.

In thinking about this, Your Honor, I do not believe that a claim for consortium survived the death of one of the spouses. In each of these cases, we have asked for the jury to award damages for consortium during the life of the deceased's spouse. I don't think that survives death because that's a joint claim. *I'm just making that for the record* because I don't have a cite to give to the Court at this time, and since the jury is being asked to award damages separately for that item, if I'm right and can give the Court a cite, that's something that can be easily correctable in a post-trial motion.

*So I just wanted to have that on the record before this did go to the jury.* And I may well be wrong. I haven't been able to find a cite either way, Your Honor.

(Emphasis added). Moments later, counsel for AC & S stated: "I just wanted to join [PH's] comments about the loss of consortium." PH's counsel objected on the record, before the jury retired, specifically questioning the jury's consideration of the loss of consortium issue on the basis that the joint claim of loss of consortium does not survive the death of a spouse. AC & S agreed with PH, and joined in the objection, on the same grounds. Accordingly, we hold that the issue is preserved. *See Edmonds v. Murphy*, 83 Md.App. 133, 177–78, 573 A.2d 853 (1990), *aff'd*, 325 Md. 342, 601 A.2d 102 (1992); *Moats v. Ashburn*, 60 Md.App. 487, 492–93, 483 A.2d 791 (1984).

█ Appellants argue that the trial court erred in allowing the jury to award Ms. Asner, Ms. Wilson, and Ms. Payne damages for both loss of consortium and loss of solatium. Specifically, appellants assert that the joint action for loss of consortium logically terminates on the death of either spouse, that recovery for both types of damages is a double recovery inconsistent with Maryland law, and that, because Maryland's Wrongful Death Statute does not provide for consortium damages, they are not recoverable. We disagree and explain.

"The loss of consortium, as used in the cases in Maryland and elsewhere, means the loss of society, affection, assistance and conjugal fellowship. It includes the loss or impairment of sexual relations." *Deems v. Western Maryland Ry.*, 247 Md. 95, 100, 231 A.2d 514 (1967). Solatium damages, on the other hand, are awarded "[f]or the death of a spouse . . . [and] may include damages for mental anguish, emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, parental care, filial care, attention, advice, counsel, training, guidance, or education where applicable." Md. Cts. & Jud.Proc.Code Ann., § 3–904(d) (1989).

Maryland statutory law permits a personal representative to bring a survival action on behalf of a decedent. A personal representative

> may prosecute, defend, or submit to arbitration actions, claims, or proceedings in any appropriate jurisdiction for the protection or benefit of the estate, including the commencement of a personal action which the decedent might have commenced or prosecuted, except that:
>
> (1) A personal representative *may not institute an action against a defendant for slander* against the decedent during the lifetime of the decedent.

Md.Est. & Trusts Code Ann., § 7–401(x)(1) (1991) (emphasis added). A personal representative is prevented only from initiating a slander suit. "Where a statute expressly provides for certain exclusions, others should not be slightly read therein by implication, for if the Legislature intends other exclusions it is so easy to add them to the already-named

explicit ones." *State Ins. Comm'r v. Nationwide Mut. Ins. Co.*, 241 Md. 108, 117, 215 A.2d 749 (1966).

We agree with appellees that, under § 7–401(x), a personal representative can initiate a suit on behalf of the estate, although the cause of action may be a joint cause of action; a personal representative steps into the shoes of decedent. Also, we agree that, because of the statutory powers vested in the personal representative, the cause of action for loss of consortium does survive the death of the spouse, even though the measure of damages logically terminates at the death of the spouse. *Monias v. Endal*, 330 Md. 274, 283 n. 5, 623 A.2d 656 (1993) (" '[L]oss of consortium [is] . . . only to be considered during the joint lives of the parties. Those *damages* would cease at the death of either party.' " (emphasis added)).

With regard to appellants' claims that recovery for both solatium and consortium damages constitutes an impermissible double recovery, we rely on the seminal case of *Stewart v. United Electric Light & Power Co.*, 104 Md. 332, 65 A. 49 (1906), in which the Court of Appeals addressed the differences between a survival action and a wrongful death action.

> The points of difference between [the wrongful death action] and the [survival action] are striking and marked even upon a casual comparison of the two enactments. The suits are by different persons, the damages go into different channels, and are recovered upon different grounds, and the causes of action though growing out of the same wrongful act or neglect, are entirely distinct. . . . [I]t must be presumed that the Legislature intended by the [survival action] to give a remedy for the injuries which the [wrongful death statute] did not cover.

*Id.* at 338–39, 65 A. 49.

In a survival action, damages are measured in terms of the *harm to the victim;* in a wrongful death action, damages are measured in terms of the *harm to others* from the loss of the victim. *Globe Am. Casualty Co. v. Chung*, 76

Md.App. 524, 527, 547 A.2d 654 (1988), *vacated on other grounds,* 322 Md. 713, 589 A.2d 956 (1991). Damages in a survival action are limited to the damages that would have been recoverable by the decedent had he survived, *i.e.,* appropriate compensation for the time between injury and death, which includes loss of consortium damages. Wrongful death damages, on the other hand, compensate persons who are damaged because of the decedent's death. *Id.* at 538–39, 547 A.2d 654. Loss of consortium damages are not recoverable under the wrongful death statute because of the nature of the claim. *United States v. Streidel,* 329 Md. 533, 544, 620 A.2d 905 (1993) (stating that loss of consortium damages are associated with personal injury and are awarded to compensate the person injured). Loss of consortium damages are not designed to compensate the party entitled to damages in a wrongful death case for the loss of the deceased.

The survival action covers damages to which the decedent was entitled while he was alive. Because the decedent would have been entitled, along with his spouse, to damages for loss of consortium, it follows that such damages may be awarded in the survival action as elements of loss to both the decedent and to his surviving spouse. The wrongful death action, on the other hand, covers damages resulting from the death of the decedent. In this action, it is the survivors who recover damages that result from the death of the decedent. Md.Cts. & Jud.Proc.Code Ann., § 3–904(d) (1989). The fact that the beneficiaries under a wrongful death action and a survival action may be identical is of no consequence. *Globe Am.,* 76 Md.App. at 534–35, 547 A.2d 654. The clear distinction that Maryland maintains between these two causes of action avoids the "problem of duplication in the element of damages." *Id.* at 538, 547 A.2d 654.

We hold, therefore, that the death of a spouse ends the measure of damages for loss of consortium and begins the measure of damages for solatium; however, the death of a spouse does not terminate the cause of action for loss of consortium. *See Knauer v. Johns–Manville Corp.,* 638

F.Supp. 1369, 1386–87 (D.Md.1986) (the parties agreed that decedent's claim for certain damages sustained before his death, including loss of consortium, can be asserted by decedent's wife as personal representative of her husband's estate, pursuant to Maryland's survival statute).

### D. Exposure to Asbestos of Non-parties

Appellees successfully moved *in limine* to bar appellants from introducing evidence of the decedents' exposure to asbestos products from non-parties. The court advised the jury that

[s]ometimes, inadvertently, products of persons or companies other than those that are involved in this proceeding are mentioned.

You are to disregard any reference to products of any companies or organizations or persons or parties that are not a subject of this proceeding before you at this time.

PH asserts that the trial court's ruling contravenes Maryland law. Specifically, PH asserts that, the trier of fact must be made aware of all asbestos products to which a decedent was exposed, so that it can determine, by way of comparison, whether a particular party's asbestos product was a substantial contributing factor. The Court of Appeals decision in *Eagle–Picher Industries v. Balbos,* 326 Md. 179, 604 A.2d 445 (1992), compels us to hold that the trial court did not err in excluding evidence of decedents' exposures to the asbestos products of non-parties.

In Maryland, to determine whether a certain manufacturer's or supplier's asbestos product was a substantial cause of a decedent's illness, in a products liability case involving *multiple companies,* the analysis

involves the interrelationship between the use of *a* defendant's product[,] ... the relationship between the activities of the direct users of *the* product and the bystander plaintiff[,] ... the nature of *the* product, the frequency of *its* use, the proximity, in distance and in time, of a plaintiff to the

use of *a* product, and the regularity of the exposure of that plaintiff to the use of *that* product.

*Balbos,* 326 Md. at 208, 604 A.2d 445 (emphasis added). The analysis of substantial causation, therefore, focuses upon the plaintiff's exposure to *the* defendant's product and not upon the plaintiff's exposure to all products.

Moreover, a manufacturer or supplier of asbestos-containing products cannot defend substantial causation by arguing that a decedent was exposed to other companies' asbestos-products.

> "[W]here the plaintiff has sufficiently demonstrated both lung disease resulting from exposure to asbestos and that the exposure was to the asbestos products of many different, but identified, suppliers, *no supplier enjoys a causation defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other suppliers.*"

*Id.* at 209, 604 A.2d 445 (emphasis added). The Court of Appeals stated clearly, in *Balbos,* that a decedent's exposure to asbestos-containing products of non-parties is *not* relevant to the determination of substantial causation.

Although the decisions from the other jurisdictions that have decided this issue are not uniform, we find persuasive the cases that hold that evidence of exposure to a non-party defendant's asbestos products is wholly irrelevant. In *Kochan v. Owens–Corning Fiberglass Corp.,* 242 Ill.App.3d 781, 182 Ill.Dec. 814, 610 N.E.2d 683 (1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994), the plaintiffs brought suit to recover damages for personal injury resulting from their exposure to asbestos-containing products. As in the case *sub judice,* in *Kochan* evidence that the plaintiffs had been exposed to asbestos-containing products manufactured or distributed by companies other than the defendants was excluded. Affirming, the *Kochan* court reasoned

> that there can be more than one proximate cause of an injury and ... that evidence of exposure to other asbestos-containing products is not relevant ... in cases in which actual cause or cause in fact is disputed.... Because of

the[ ] difficulties in proof of causation in asbestos cases, our supreme court adopted the "frequency, regularity and proximity" test. . . . *Allowing a defendant to present evidence of a plaintiff's exposures to other products whose manufacturers are not defendants in the trial would only confuse the jury, with a possible result that a defendant could be unjustly relieved of liability. The purpose for which the evidence is offered is inconsequential, for the effect is the same: the shift of blame to another manufacturer.*

*Id.,* 182 Ill.Dec. at 819–20, 610 N.E.2d at 688–89 (emphasis added).

We agree with the reasoning that "[t]he question for the jury to consider, with or without evidence of exposure to other products, is the same: whether the evidence against the particular defendant at trial was sufficient to find that particular defendant's product was an actual cause or cause in fact of plaintiff's injury." *Id.* at 820, 610 N.E.2d at 689. The *Kochan* court recognized, just as the Court of Appeals did in *Balbos, supra,* that, " 'it is no defense that some other person or thing contributed to bringing about the result for which damages were claimed. . . . Thus, the fact that plaintiff used a variety of asbestos products does not relieve defendant of liability for his injuries.' " *Id.* at 819, 610 N.E.2d at 688 (quoting *Lipke v. Celotex Corp.,* 153 Ill.App.3d 498, 106 Ill.Dec. 422, 430, 505 N.E.2d 1213, 1221 (1987), *appeal dismissed,* 129 Ill.Dec. 387, 536 N.E.2d 71 (1989)). Illinois courts, like Maryland courts, consider the frequency, proximity, and regularity of a plaintiff's exposure to the asbestos product when determining whether a particular product was a substantial cause of a plaintiff's illness.

Excluding, as irrelevant, the evidence of a decedent's exposure to asbestos products of non-parties does not lessen the plaintiff's burden of proving that the defendant's product was a substantial cause of his injury. Moreover, the defendant can still negate liability by showing that the plaintiff was not exposed to its products, that any exposure was insufficient to cause injury, or that its products contained an insufficient amount of asbestos to cause injury. *See Kochan,* 182 Ill.Dec.

at 820, 610 N.E.2d at 689. Additionally, evidence of a plaintiff's exposure to asbestos-containing products of non-parties can still be properly admissible when defendant manufacturers or suppliers are proving their cross-claims against other manufacturers or suppliers.

In *Tragarz v. Keene Corp.*, 980 F.2d 411 (7th Cir.1992), the court rejected the defendants' argument that the

substantial factor test is a comparative test in which the jury assesses all contributing causes and determines which ones are substantial. This seems to misstate the nature of the substantial factor inquiry under Illinois [and Maryland] law because the Illinois [and Maryland] courts in applying the substantial factor test do not seem concerned with which of the many contributing causes are *most* substantial. Rather, they seem concerned with whether each contributing cause, standing alone, is a substantial factor in causing the alleged injury.

*Id.* at 424. We agree with the Seventh Circuit that a comparative approach to the substantial factor test would create the same inequities that result when applying the "but-for test," previously rejected by Maryland courts for application in multi-defendant asbestos products liability cases.

We hold that a decedent's exposure to each defendant's product should be evaluated independently to determine whether such exposure was a substantial factor in causing the decedent's injury; evidence of exposures to other products is not relevant to such an inquiry. *See Gideon v. Johns–Manville Sales Corp.*, 761 F.2d 1129, 1141 (5th Cir.1985) (holding that evidence of Gideon's exposure to the products of two companies that had filed for bankruptcy was not material to the litigation, so long as the jury found that the products of each defendant cast in judgment were producing causes of Gideon's condition). *But see Laney v. Celotex Corp.*, 901 F.2d 1319, 1320 (6th Cir.1990) (holding that, under Michigan law, evidence of other products to which the plaintiff may have been exposed is relevant to rebut the plaintiff's claim); *Fibreboard Corp. v. Pool*, 813 S.W.2d 658, 695 (Tex.Ct.App.1991)

(holding that it was harmless error for the trial court to exclude testimony regarding other insolvent companies).

### E. Johns–Manville Sales to Fairfield

Appellees introduced evidence that PH exclusively distributed certain Johns–Manville (JM) thermal insulation products in the Baltimore area, to establish PH's liability for appellees' exposure to these JM products. During the Payne case, PH sought to introduce three invoices showing direct sales of JM products to Fairfield in an attempt to rebut appellees contention. The trial court, however, sustained appellees' objection to the evidence, and excluded the exhibits. PH argues that this exclusion was "clear error and extremely prejudicial" because it was unable to rebut appellees' evidence of its exclusive distributorship of JM products to Fairfield during Payne's employment at Fairfield. We disagree.

Appellees, through testimony, indicated that only certain JM products were part of the exclusive distributorship arrangement between JM and PH. Specifically, appellees alleged that the JM exclusive distributorship arrangement involved products known as 85% Mag pipe covering and block, Thermasbestos pipe covering and block, and numbers 302, 352, and 450 finishing cements. These products were used extensively by the insulators. None of these products, however, were the subject of the invoices. Rather the "Super X" product listed on the invoices was described by William E. Whitley, a PH insulator for approximately thirty-eight years, as a refractory material that was "used very rarely" by insulators.

"A trial judge has a very broad discretion in determining relevancy." *Billman v. State Deposit Ins. Fund Corp.,* 88 Md.App. 79, 117, 593 A.2d 684 (1991). The trial court, in ruling the invoices inadmissible, obviously found the invoices to be irrelevant and immaterial to refuting appellees' claim of exclusive distributorship; appellees did not claim that "Super X" block was part of the exclusive distributorship. "[T]he trial judge exercised his discretion concerning the relevancy and materiality of the evidence. He did not abuse his discre-

tion." *Lomax v. Comptroller*, 88 Md.App. 50, 55, 591 A.2d 1311 (1991).

### F. Substantial Factor Causation

As indicated *supra*, AC & S contests substantial factor causation in the Wilson case only, and PH contests substantial factor causation in the Payne case only.

### 1. The Law

As mentioned in section IV., *supra*, to determine whether a particular product was a substantial cause of a plaintiff's illness, Maryland courts consider the frequency, proximity, and regularity of a plaintiff's exposure to the product. *Eagle–Picher Indus. v. Balbos*, 326 Md. 179, 210, 604 A.2d 445 (1992). Under the substantial factor causation rule

"[t]he actor's negligent conduct is a legal cause of harm to another if

(a) his conduct is a substantial factor in bringing about the harm, and

(b) there is no rule of law relieving the actor from liability because of the manner in which his negligence has resulted in the harm."

*Id.* at 208–09, 604 A.2d 445 (quoting Restatement (Second) of Torts § 431 (1965)).

In products liability involving asbestos, where the plaintiff has sufficiently demonstrated both lung disease resulting from exposure to asbestos and that the exposure was to the asbestos products of many different, but identified, suppliers, no supplier enjoys a causation defense solely on the ground that the plaintiff would probably have suffered the same disease from inhaling fibers originating from the products of other suppliers.

*Id.* at 209, 604 A.2d 445. Therefore, the failure to warn on the part of any one supplier can operate as a concurrent proximate cause with the failures to warn of the other suppliers.

*Id.* A decedent's exposure to a party's product may be established circumstantially. *Id.* at 210, 604 A.2d 445.

In the case *sub judice,* neither decedent installed asbestos products for either AC & S or PH; rather, they were bystanders.

> Whether the exposure of any given bystander to any particular supplier's product will be legally sufficient to permit a finding of substantial-factor causation is fact specific to each case. The finding involves the interrelationship between the use of a defendant's product at the workplace and the activities of the plaintiff at the workplace.

> This requires an understanding of the physical characteristics of the workplace and of the relationship between the activities of the direct users of the product and the bystander plaintiff. Within that context, the factors to be evaluated include the nature of the product, the frequency of its use, the proximity, in distance and in time, of a plaintiff to the use of a product, and the regularity of the exposure of that plaintiff to the use of that product. "In addition, trial courts must consider the evidence presented as to medical causation of the plaintiff's particular disease."

*Id.* at 210–11, 604 A.2d 445 (quoting *Lockwood v. AC & S, Inc.,* 109 Wash.2d 235, 744 P.2d 605, 613 (1987)).

## 2. AC & S's Substantial Factor Causation

 "The causation question here is whether the evidence and inferences most favorable to [Ms. Wilson] support a finding that exposure to [AC & S's] products was a substantial factor in the death of [Wilson]." *Id.,* 326 Md. at 210, 604 A.2d 445. AC & S asserts that appellees' proof does not meet the minimum standard set forth in *Balbos,* and, therefore, there was insufficient evidence for the jury to find that exposure to AC & S's products was a substantial factor in causing Wilson's mesothelioma. We disagree.

Wilson worked at ABL, and ABL pipefitters used AC & S products. Mr. Lohr, one of Wilson's co-workers, saw Wilson almost every day and testified that Wilson worked around the

AC & S products and was exposed to the large quantity of asbestos dust created when the asbestos cement was mixed. As a supervisor of the sheet metal workers from 1946 until 1975, Wilson constantly monitored the workers responsible for covering the asbestos insulation placed on the boilers and pipes. Although he did not use the asbestos directly, Wilson was constantly around the insulating asbestos cement while it was being dumped, mixed, and applied, and was consequently exposed to asbestos dust.

The medical evidence supports substantial factor causation. Dr. Edward Gabrielson, board certified anatomic and clinical pathologist in the Department of Pathology at Francis Scott Key Medical Center, testified that asbestos exposure is the only cause of mesothelioma, and that the exposure necessary to cause mesothelioma need only be very brief. Moreover, he stated that there is no safe level of exposure to asbestos, and that *each exposure to asbestos is a causative factor in the development of mesothelioma.*

Dr. Lewis J. Rubin, head of the Division of Pulmonary and Critical Medicine at the University of Maryland Medical System, testified about Wilson's exposure to asbestos while working at ABL. Dr. Rubin testified that each and every exposure to asbestos that Wilson had during that period contributed to his mesothelioma. Dr. Rubin stated, to a reasonable degree of medical certainty, that any industrial or occupational exposure to respirable asbestos dust would be a contributing factor to the development of the disease. Additionally, Dr. Jerrold Abraham, pathologist at the State University of New York in Syracuse, testified that all of Wilson's exposures, while working at ABL, would be substantial contributing factors to the development of his mesothelioma. Applying the *Balbos* factors discussed *supra,* we hold that the evidence presented at trial supports the jury's finding that Wilson's exposure to AC & S products was a substantial cause of his mesothelioma.

### 3. PH's Substantial Factor Causation

As stated *supra,* "[t]he causation question here is whether the evidence and inferences most favorable to [Ms.

Payne and Ms. Hess] support a finding that exposure to [PH's] products was a substantial factor in the death of [Payne]." *Balbos*, 326 Md. at 210, 604 A.2d 445. PH and JM products were at Fairfield the entire time that Payne worked there as an electrician. Additionally, Mr. Liphard, Payne's co-worker, testified that Payne usually worked in the engine rooms where he was exposed to asbestos dust that was "always coming … like snow." Mr. Liphard stated that, in the engine rooms, he and Payne were always exposed to the products used by the insulators, including PH and JM products. Payne regularly worked in the proximity of insulators who caused "asbestos snow storms" using PH and JM asbestos products.

The medical testimony of Dr. Gabrielson, discussed *supra*, was also presented in the Payne case. Dr. Gabrielson testified, to a reasonable degree of medical certainty, that Payne's "exposure to any of that dust or all of the dust containing asbestos from the cement products would have contributed to the development of the mesothelioma." Applying the *Balbos* factors discussed *supra*, we hold that the evidence presented at trial could support the jury's finding that Payne's exposure to PH's products was a substantial cause of his mesothelioma.

### III. CONCLUSION

To summarize our holdings:

I. A motion for judgment on the issue of punitive damages in a products liability case must be denied if the plaintiff has established, by clear and convincing evidence, actual malice as set forth by the Court of Appeals in *Owens–Illinois, Inc. v. Zenobia.* In the case *sub judice*, the trial court did not err in denying AC & S's motion for judgment on the issue of punitive damages in the Asner and Wilson cases and the trial court did not err in denying PH's motion for judgment on the issue of punitive damages in the Asner, Wilson, and Payne cases.

II. Because it was not relevant, the trial court did not err in granting appellees' motion to exclude evidence of TLVs.

III. The death of an injured spouse does not abate the cause of action for loss of consortium. Therefore both loss of consortium damages and solatium damages may be recovered respectively by the personal representative and the surviving spouse.

IV. The trial court correctly excluded evidence of the decedent's exposures to the asbestos products of non-parties.

V. The three invoices that appellants attempted to introduce at trial regarding sales of JM products were properly excluded as irrelevant.

VI. There was sufficient evidence for the jury to find that Wilson's exposure to AC & S products was a substantial cause of his death and that Payne's exposure to PH products was a substantial cause of his death.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED; COSTS TO BE PAID BY APPELLANTS.**